Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Employee is George Ester Fennell.
2. The Employer is Piggly Wiggly Stores.
3. The carrier on the risk at the time of the onset of the occupational disease was Royal SunAlliance.
4. The Employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. The Employer-Employee relationship existed between the Employer and the Employee on the 27th day of May 2000, the alleged date of onset.
5. Plaintiff's average weekly wage was $257.86, which yields a workers' compensation rate of $171.91.
6. Plaintiff's claim is for bilateral carpal tunnel syndrome, an occupational disease due to causes and conditions characteristic of and peculiar to her employment with Piggly Wiggly, which said claim Defendants have denied as compensable.
7. A set of bound and paginated medical, rehabilitation, and Industrial Commission records was stipulated by the parties into evidence.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. The issue before the Full Commission is whether Plaintiff's claim for bilateral carpal tunnel syndrome is compensable.
2. Plaintiff was born on May 23, 1951 and has a tenth grade education. She began worked for Defendant-Employer, Piggly Wiggly, from 1990 and worked through 1993 and from 1995 through May 2000.
3. Plaintiff worked as a deli assistant for Piggly Wiggly. She would arrive at work at five o'clock in the morning, five days a week. She began her workday by taking a water hose, attaching the hose to the kitchen sink and then pulling the hose to the steam table. She then filled the steam table with water. When Plaintiff finished filling the steam table she would take the water hose back into the kitchen and unscrew the hose from the kitchen sink. Plaintiff then returned to the steam table and turned on each of the six nozzles on the steam table. At some point the steam table was changed, and Plaintiff no longer had to use the hose to fill the steam table.
4. Plaintiff's next daily task was to prepare biscuits by lifting the five to ten pound bag of biscuits out of the freezer. She would then open the bag and place each biscuit onto a cookie sheet, twenty-five to thirty biscuits per sheets, and place the biscuits in the oven. She would repeat this process for four to six sheets.
5. After Plaintiff prepared the biscuits, she made coffee. She would carry water from the sink to fill up the coffeepot. Plaintiff would hold the opening of the coffeepot open with her left hand. With her right hand, Plaintiff would pour the water in the top of the machine. She would then slide out the coffee filter basket. She then would take a coffee filter and place it in the basket. She would put a pack of coffee atop the filter, slide the basket back into the coffeepot and would turn the coffeepot on. Plaintiff repeated this four to five times every morning.
6. When Plaintiff finished making the first pot of coffee, she would check to see if she had enough catsup, forks, cups, plates, bags and napkins. If there were not enough supplies, she would take a cart to the supply shelf in order to fill it with supplies. Many times, Plaintiff was unable to reach the supplies, so she would take a mop or broom and utilize the handle to knock the bagged supplies down. Plaintiff would then take the bagged supplies, place them onto the cart, and take the supplies to the counter. She then would arrange them on the counter. Plaintiff would keep extra supplies underneath the counter.
7. Plaintiff's next task was to check the dining room to ensure it was clean and the salt and pepper containers were filled. If the salt and pepper containers were not filled, she would take the tops off the container, get a box of salt and pour it into the salt container and do the same for the pepper container. Plaintiff then had to check the trash cans in case they were not emptied the previous night. She would have to pull the plastic liner bags out of the cans with both hands, load the plastic bag of trash onto a cart, and push the cart to the back of the store and out the back door. Plaintiff would then lift the plastic bags off the cart with both hands and place them into the garbage dumpster.
8. Plaintiff next would return to the dining room. If the ice machine in the dining room was not working properly, Plaintiff would go to the back of the deli, get a five-gallon bucket and using her right hand, dip ice out of the ice machine using an ice scoop. She would then take the five-gallon bucket filled with ice back to the dining room, and pour the ice into the ice machine. The ice machine held approximately twenty gallons of ice. Even when the machine was operating, Plaintiff would have to fill the drink machine with ice from the ice machine. To accomplish this task, she had to use her hands to hold an ice scoop and dip ice out of the ice machine into a five-gallon bucket. Plaintiff would then take the five-gallon bucket filled with ice to the drink machine, and pour the ice into the drink machine while standing on a stool. If the drink containers were empty, Plaintiff had to go to the back of the deli, get a filled container, bring the filled container to the front, unhook the empty container's nozzle using her right hand to unscrew the container nozzle with a wrench-like mechanism, hook the filled container with her right hand using the wrench-like mechanism to screw in the nozzle of the filled container tightly, and lift the container and set it into the drink cabinet.
9. Plaintiff would then go back to the bakery. She would remove her biscuits from the oven and brush melted butter on top of each biscuit with her right hand. She would then set each biscuit on the steam table onto another pan by using a spatula with her right hand. This process would take a few minutes to complete.
10. Plaintiff would then go to the kitchen and assist the cook by helping the cook prepare breakfast. Plaintiff would drop bacon and sausage into a deep fryer using her right hand. She would also dip grits by using a small pot to dip grits out of a big pot onto a metal serving tray with her right hand. After the grits were dipped on the tray, Plaintiff would pick up the tray and carry the tray to the steam table. Plaintiff would also help load the other breakfast foods such as eggs, bacon, sausage, ham, gravy and liver pudding onto the steam table. The steam table was a long counter with seven sections. In order to set up the steam table, Plaintiff would have to put pans in place in each section using both hands. Each pan would be filled with trays of food.
11. Plaintiff started serving food at six o'clock in the morning. If a person scheduled to begin work at six o'clock did not arrive, Plaintiff would have to work the cash register and the serving line. She would prepare the customer's order. For example, if a customer wanted a sausage biscuit, Plaintiff would take a knife in her right hand and cut open the biscuit; she would then lift the sausage from the tray with a pair of tongs, cut the sausage, place the sausage in the biscuit and then wrap the biscuit. If a customer wanted an entire breakfast, Plaintiff, using her right hand, would dip the grits and place them onto a styrofoam plate, dip the eggs with her right hand and place them onto the plate, and then using a pair of tongs would place the sausage or bacon on the plate. She would mark the plates with the price of the meal with a pencil using her right hand. If the customer did not take the meal up to the front to pay for it, Plaintiff would use the cash register where she was stationed to receive payment. She would key in the price, take money from the customer, put the money into the cash register, and give the customer change. She would then place the plates into a bag. If any of the food on the serving line ran out, Plaintiff would go back to the kitchen and get more food by dipping more grits or dropping more sausage and bacon and then carrying the food back to the steam table. In addition to her serving and replenishing duties, Plaintiff had to constantly stir the food with a long handled spoon, using her right hand, to keep it from hardening.
12. When the breakfast line slowed down at approximately ten o'clock in the morning, Plaintiff would begin working on the cold case, a counter where salads, including lettuce, chicken and/or tuna salads and desserts were displayed. Ingredients for salads and desserts would be sliced, chopped and/or mixed by hand and Plaintiff would have to hand scoop certain salads into individual, "to-go" containers. Preparing the cold case took approximately two to three hours because while Plaintiff prepared the cold case she also had to work the line, operate the cash register and slice meat. When a customer requested sliced meat, Plaintiff would remove the meat from the cold case and place it onto a meat cutter. Plaintiff would push the slicer back and forth with her right hand, her left hand holding the meat in place. She would help prepare the salads for the cold case. She would chop vegetables such as heads of lettuce, cucumbers and carrots and fruits such as watermelon, cantaloupe, peaches, strawberries, apples, and honeydew melons with a knife, using her right hand. She would then take the various salads, put them into a container, and set them into the cold case. Plaintiff did not have to make some of the other salads, such as potato salad and coleslaw. For those she would remove the five to eight-pound cartons from the freezer, bring the cartons up front, open the cartons and dip the salads with a spoon into a serving pan. In addition to the salads, she prepared strawberry shortcake, banana pudding and other desserts. Plaintiff also had to clean the bottom of the cold case using hot, soapy water, a dishrag and window cleaner.
13. After Plaintiff finished working on the cold case and breakfast was no longer being served, she had to clear the steam table, and dump any leftover food into a trash bag. She would then take the bagged food back to the dumpster. When Plaintiff returned to the deli, she would take the emptied trays into the kitchen and put them into the sink, washing them between breakfast and lunch, often scrubbing the bottoms of some pans with steel wool.
14. After Plaintiff cleared the steam table from breakfast, she would assist the cook in preparing dinner by breading and dropping over a hundred pieces of chicken into a deep fryer and preparing other foods. She then prepared the steam table for lunch by placing pans onto the steam table and filling them up with food. Plaintiff would work the lunch line and the cash register. After lunch was no longer being served, she would clean off the steam table again, empty trash cans again, sweep and mop the dining area and deli, clean the tables, and bring supplies for the night shift.
15. Plaintiff's workday finished at one o'clock in the afternoon. Plaintiff's testimony established that Plaintiff's job involved gripping and pinching, wrist movement, hand gripping, and lateral pinching. These activities were performed for short periods of time, but in back-to-back sequence from five o'clock in the morning until one o'clock in the afternoon.
16. Plaintiff first complained of problems with her hands in 1998. Dr. Kimberly Grigsby-Sessoms initially suggested Plaintiff's hand complaints were indicative of carpal tunnel syndrome. Plaintiff had a recurrence of her hand problems in April 2000. She complained of persistent swelling in her hands and having trouble holding things. Dr. Grigsby-Sessoms ordered a thyroid test and the test result was normal.
17. Plaintiff also saw Dr. Henry L. Moss for treatment of her hand problems in April 2000. Plaintiff complained of ongoing problems with numbness and tingling in her hands with worsening pain. Dr. Moss noted Plaintiff had no history of diabetes or thyroid disorder. Dr. Moss reviewed nerve conduction studies that had been performed and diagnosed Plaintiff with advanced carpal tunnel syndrome.
18. Dr. James E. Lowe, Jr. initially saw Plaintiff in July 2001, for bilateral carpal tunnel syndrome. Dr. Lowe diagnosed Plaintiff with severe bilateral carpal tunnel syndrome. He recommended she undergo a bilateral carpal tunnel release as well as a synovectomy. Dr. Lowe stated that due to the long-standing nature of Plaintiff's condition, he thought she would develop aneuroma or significant scar tissue, which would require further surgical procedures. Dr. Lowe concluded in a June 26, 2003 letter, "[b]ecause [Plaintiff] has progressed at this point to a very minimal function within her median nerve and now the right ulnar nerve, I believe that [Plaintiff] cannot even work doing non-repetitive work at this point. I believe she is totally disabled."
19. Plaintiff filed a Form 18 Notice of Accident on October 26, 2001, alleging bilateral carpal tunnel syndrome to hands due to duties assigned by Defendant-Employer. Defendants filed a Form 61 on September 16, 2002, denying liability.
20. Plaintiff testified at the hearing that she continues to have problems with her fingers "locking up" into a fist and has difficulty opening her hand. She uses styrofoam plates and cups and plastic utensils at home because she cannot handle dishes without dropping them. Plaintiff cannot use her hands to do any cooking requiring cutting food. Her pain often interrupts her sleep. She testified she had little relief from pain medications and stated that her hands hurt constantly.
21. Rebecca King, who worked closely with Plaintiff in her capacity as a cook and then as a deli manager at Piggly Wiggly, corroborated the testimony of Plaintiff regarding her job duties. She testified that Plaintiff's job required the use of her hands for most of the day. Plaintiff complained of her hand problems to Ms. King. Plaintiff would complain throughout the day about how badly her hands were hurting. Plaintiff would wear a bandage around her right wrist that would sometimes cause her right hand to swell, and then she would remove the bandage. Ms. King saw Plaintiff's hand swollen on a number of occasions. Ms. King testified that Plaintiff was a hard worker.
22. The testimony of Paige Edwards and Patricia Williams was taken at the hearing. Both worked for Piggly Wiggly in the deli area. Both individuals had also worked in the food service industry for an extended period of time. Both Ms. Edwards and Ms. Williams testified that they did not know of anyone in a similar job to Plaintiff's who had been diagnosed with carpal tunnel syndrome or complained of hand problems due to his or her job.
23. Plaintiff's expert, Leneve Duncan, a physical therapist with nineteen years of experience in performing industrial ergonomics analyses, performed an ergonomics analysis of Plaintiff's work duties. Ms. Duncan noted that Plaintiff worked from five o'clock in the morning until after lunch. Ms. Duncan conducted her analysis of the work done in the deli area from five o'clock in the morning until twelve-thirty in the afternoon. She also prepared a videtotape of some of the job activities.
24. The videotape prepared by Ms. Duncan depicted a deli worker slicing meat for approximately one minute. The worker moved to placing cookies and/or biscuits on large baking sheets and placing those sheets in the oven. The worker is then shown putting some type of meat in a food processor and then dumping the processed meat into a large mixing bowl — this process was repeated at least five times. The worker is then shown opening jars of ingredients, using a large spoon to scoop the ingredients out of the jars, and mixing the ingredients and processed meat by hand. The worker then scooped the mixture into small containers.
25. The video depicted another deli worker putting baking sheets into the oven. Another worker was then shown slicing meat, making and cutting sandwiches. A worker was shown running water into large stockpots and dumping vegetables into the large pots. A worker is shown chopping fruit, mixing the fruit into a glaze, slicing cake, placing cake slices into individual containers, and covering each cake slice with strawberries. A worker is then shown chopping vegetables using both hands and a large knife to make salads.
26. The video also depicted a worker opening large cans using a manual can opener with a crank handle. Another worker is shown slicing large cakes, placing the slices on individual trays, and wrapping each tray with plastic wrap. A worker was shown breading meat for cooking and dropping each piece of meat into cooking oil. A worker was shown scooping vegetables from large pots into small pots and empting the vegetables into large metal serving trays. A worker was shown using both hands to wash and dry dishes, and placing the dishes on shelves. A worker was shown working the cash register.
27. Finally, the video depicted a worker using an ice cream scoop to dip hushpuppy batter and drop the batter into cooking oil. The worker dropped approximately ninety-six scoops of hushpuppy batter into the cooking oil in approximately one and one-half minutes.
28. In addition to her own analysis of Plaintiff's job, Ms. Duncan reviewed a job analysis report prepared by Defendants, Plaintiff's testimony, and Plaintiff's medical records. Ms. Duncan testified that on a constant basis for more than five and a half hours out of a shift, Plaintiff's job involved gripping and pinching, wrist movement, hand gripping, and lateral pinching. She further testified that although the tasks appeared to be very short term, they were all back-to-back from five o'clock in the morning until eleven o'clock in the morning. Ms. Duncan stated the persons she observed did not take breaks other than to use the restroom. They went from one task to another, each task requiring gripping, pinching and grasping.
29. Ms. Duncan explained that force, repetition and posture, including wrist deviation, are factors taken into consideration when performing an ergonomic analysis. She noted the majority of the activities in Plaintiff's work duties required some deviation in the wrist. Ms. Duncan testified the most problematic activities for wrist deviation were baking of frozen biscuits, baking of frozen cookies, cutting vegetables for salads, slicing meat, scooping food for the cold case into plastic containers, making chicken salad and scooping the salad into plastic containers, wrapping cakes, opening a large number of tin cans of vegetables with a manual can opener, taking fried foods such as chicken from the deep fryer with tongs, dipping hushpuppy batter, and dipping vegetables from large kitchen pots into serving containers.
30. Ms. Duncan concluded that the ergonomic analysis of Plaintiff's work duties indicated Plaintiff's employment subjected her to a greater degree of risk of exposure to upper extremity disorders, such as bilateral carpal tunnel syndrome, than the general public, most significantly due to wrist deviation, posture, and repetition. Ms. Duncan opined, "[t]he wrist deviation[s] were significant enough[,] linked together that it could cause significant upper extremity disorders."
31. Defendants' expert, Glen Adams, MS, CRC, CEES studied Plaintiff's job tasks. He observed the line workers at Piggly Wiggly from eleven o'clock in the morning until one fifteen in the afternoon. His observations were documented in a forty-five minute video. Mr. Adams stated he did not view the tasks of preparing the steam table, preparing the biscuits, making coffee, supplying the dining area, filling the ice machines, preparing the dining area, preparing the cold case, making salads, making chicken salad, using a knife to cut food, clearing the steam table, emptying trays, scrubbing dishes, dropping chicken, and dropping hushpuppies. Mr. Adams viewed the activities of slicing meat and working the lunch line.
32. After observing the video taken by Ms. Duncan and her report, Mr. Adams opined that many of the activities depicted by the photographs and included in Ms. Duncan's report could increase the risk of developing carpal tunnel syndrome, depending on the duration of the activities, but he was unaware of the duration of Plaintiff's job activities. Mr. Adams testified he did not consider how long each of the tasks Plaintiff performed occurred. When asked to form an opinion regarding the increased risk for the development of carpal tunnel syndrome, Mr. Adams opined, "I really can't formulate an opinion on that particular task, because there are some variables there I would want to know."
33. Ms. Duncan reviewed Mr. Adams' video. She opined that Mr. Adams' video did not reflect the most active period for the deli workers, which was from five o'clock in the morning until eleven o'clock in the morning. Ms. King, a deli manager for Piggly Wiggly, viewed the videotapes submitted by Plaintiff and Defendants, and opined that Plaintiff's videotape was the more accurate representation depicting the duties performed all day.
34. The Full Commission gives more weight to the opinion of Ms. Duncan versus Mr. Adams regarding whether Plaintiff's job duties exposed her to a greater degree of risk to upper extremities disorders over the general public.
35. Dr. Lowe reviewed Plaintiff's work duties, hearing testimony, and the videos of both Mr. Adams and Ms. Duncan. Based upon the information he reviewed and his evaluation of Plaintiff, Dr. Lowe opined to a reasonable degree of medical certainty that Plaintiff's employment activities significantly contributed to the development of her carpal tunnel syndrome. He testified that carpal tunnel syndrome has a causative factor of repetitive activities and repetitive strain, and since Plaintiff's activities were considerably repetitive they significantly contributed to her condition. Dr. Lowe noted that from the information he was provided, it appeared the majority of Plaintiff's tasks required the use of the upper extremities in repetitive activities. Dr. Lowe further opined that Plaintiff's employment duties exposed her to a greater risk than the general public of developing of carpal tunnel syndrome. Dr. Lowe was of the opinion that Plaintiff was physically incapable of performing her work-related activities. Dr. Lowe further opined Plaintiff would require surgery in the future.
36. Dr. Lowe restricted Plaintiff to using her hands for handling or fingering for less than one hour total during the course of an eight hour day, and handling and fingering for up to five minutes sustained before having to rest during the course of an eight hour day.
37. Dr. Lowe found that Plaintiff is disabled from all work as a result of her bilateral carpal tunnel syndrome and related synovitis. Dr. Lowe recommended that Plaintiff not perform even non-repetitive work.
38. In March 2004, before the hearing with the Deputy Commissioner, Dr. Warren B. Burrows, II prepared a report of Plaintiff's condition based upon a review of medical records, the Defendants' job site video and Mr. Adams' ergonomic evaluation. Dr. Burrows, without examining Plaintiff, concluded that Plaintiff's carpal tunnel syndrome was not work-related, but was due to her age.
39. Dr. Burrows prepared a second report after reviewing Ms. Duncan's ergonomics analysis and Plaintiff's video. Dr. Burrows noted that some activities, such as using the meat slicer, mixing ingredients by hand, chopping potatoes, scooping out ingredients from a large mixing bowl, and dropping hushpuppies would possibly contribute to carpal tunnel syndrome and if performed for more than four hours a day would significantly contribute to Plaintiff's development of carpal tunnel syndrome. He stated, "[a]ll jobs essentially require continuous use of the hands to some degree." Dr. Burrows concluded that "if the jobs are not continuous but are additive that the additive hours would have to be four hours or more to be considered at risk."
40. Vocational expert, Robert E. Manning, Jr., M.S., C.R.C., completed a vocational assessment of Plaintiff. Mr. Manning reviewed Plaintiff's medical records, school records, and work history. In reviewing Plaintiff's work history, Mr. Manning opined, "[Piggly Wiggly] was basically her only employer." Mr. Manning reviewed Plaintiff's physical restrictions from Dr. Lowe.
41. Mr. Manning also performed a labor market survey. He stated that placement in a significant number of jobs generally required an ability to lift or carry items or products for customers, to assist in the reshelving and stocking of store items, the ability to assist customers in the selection or pulling of products and in retrieving items, recent hands-on retail sales experience, knowledge in hands-on skills in utilizing a point of sale cash register in retail settings, the ability to assist in required clean up duties, or the ability to use upper extremities for more than a few minutes. He testified that the employers with whom he consulted, expressed concerns regarding Plaintiff's inability to use her upper extremities to lift, pull, reshelve products, and clean. The labor market survey in this case did not encompass Wilmington, North Carolina, and Jacksonville, North Carolina, which are just over 40 miles from Wallace, North Carolina, where Plaintiff lived.
42. Mr. Manning opined within a reasonable degree of vocational certainty that given Plaintiff's education, work history, and physical restrictions, she would not be able to return to her past work. When asked whether Plaintiff could return to other competitive employment he opined Plaintiff "at best has marginal skills and certainly now has significant limitations and restrictions," and he further stated that she did not have transferable skills that would allow her to transition to other types of employment. He opined that Plaintiff "has experienced a significant loss of the labor market and a complete loss of wage earning capacity." He was unaware of any employer who would employ Plaintiff. He concluded, "In my opinion . . . there are no reasonable, suitable job opportunities for her when considering the prescribed limitations, limited transferable skills, and employer expectations in the local labor market."
43. Mr. Manning noted that Plaintiff lived in Duplin County, a rural area with "lots of farms and farm related industries." He stated Wallace and Burgaw were "struggling to keep their head above water right now" since there were a number of faltering companies resulting in job losses. Mr. Manning opined, "[I]t just makes it very difficult when you are in a fairly small job market trying to sell an injured employee to an employer." Mr. Manning concluded in his Vocational Rehabilitation Report, "I do not think it is reasonable to expect that [Plaintiff] will be able to return to work in any capacity in the local labor market."
44. The Full Commission finds Plaintiff's testimony concerning her job responsibilities to be credible.
45. Dr. Lowe testified that Plaintiff's job activities were considerably repetitive and they significantly contributed to her condition. Based on his examination of the Plaintiff and his review of the videotapes of Plaintiff's job duties, Dr. Lowe was of the opinion and the Full Commission finds that Plaintiff's job involved gripping and pinching, wrist movement, hand gripping, and lateral pinching on a very short term, but back-to-back sequence from approximately five o'clock in the morning until one o'clock in the afternoon, and Plaintiff's job placed Plaintiff at an increased risk than the general public of contracting carpal tunnel syndrome. The Full Commission further finds that the job duties of Plaintiff significantly contributed to, or were a significant causal factor in the development of her carpal tunnel syndrome.
46. The greater weight of the evidence establishes that Plaintiff has not returned to work in any capacity since May 27, 2000, and continues to be totally disabled as a result of her bilateral carpal tunnel syndrome and related hand conditions.
47. The medical treatment Plaintiff received as a result of her injuries and occupational diseases was reasonably required to effect a cure, provide relief and lessen her disability.
48. Plaintiff will need future medical treatment for her compensable occupational disease.
49. Plaintiff has not reached maximum medical improvement.
50. Plaintiff's average weekly wage on the relevant dates was $257.86, which results in a compensation rate of $171.91.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. To prove a compensable occupational disease pursuant to N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that his condition meets three criteria: (a) the condition is "characteristic of persons engaged in the particular trade or occupation in which the [Plaintiff] is engaged," (b) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation," and (c) there is a "causal connection between the disease and the [Plaintiff's] employment" in that the employment significantly contributed to or was a significant causal factor in the disease's development. Rutledge v. Tultex Corp., 308 N.C. 85,93, 301 S.E.2d 359, 365 (1983). The first two requirements of this test are met if Plaintiff can show that the employment created an increased risk for contracting the particular disease than the general public. Id.
at 94, 301 S.E.2d at 365. Based upon the greater weight of the evidence, Plaintiff's job duties placed her at a increased risk for contracting bilateral carpal tunnel syndrome and related synovitis than the general public, and Plaintiff's job duties significantly contributed to, or were a significant causing factor in the development of her bilateral carpal tunnel syndrome and related synovitis.
2. Plaintiff's average weekly wage on the relevant dates was $257.86, which results in a compensation rate of $171.91.
3. As a result primarily of her bilateral carpal tunnel syndrome but also her related synovitis, Plaintiff has been totally disabled since May 28, 2000 and is entitled to be paid by Defendants total disability compensation at the rate of $171.91 per week from May 28, 2000, and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants pay for all medical expenses incurred and medical expenses to be incurred in the future as a result of her bilateral carpal tunnel syndrome and related hand condition, for so long as such treatment is reasonably necessary to effect a cure, provide relief and/or lessen her period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to Plaintiff temporary total disability compensation from May 28, 2000, through the date of the hearing before the Deputy Commissioner and continuing at the rate of $171.91 per week until further order of the Industrial Commission.
2. Defendants shall pay all of Plaintiff's past and future medical expenses related to her compensable occupational disease for so long as such treatment is necessary to effect a cure, provide relief and/or lessen his period of disability when bills for the same have been approved according to Industrial Commission procedure.
3. Twenty-five percent of the compensation awarded Plaintiff in paragraph 1 of this AWARD is approved as a fee for Plaintiff's attorney and shall be deducted and paid directly to Plaintiff's attorney as follows: (a) twenty-five percent of Plaintiff's accrued compensation shall be deducted and paid directly to Plaintiff's attorney, and (b) thereafter, every fourth check from the compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney.
4. Defendants shall pay the costs.
This the ____ day of February 2006.
 S/ ___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/________________ LAURA K. MAVRETIC COMMISSIONER
DISSENTING:
 S/________________ DIANNE C. SELLERS COMMISSIONER